[Civ. No. 3944. Third Appellate District.—September 25, 1930.]

HORACE M. WALKER et al., Respondents, v. DEPARTMENT OF PUBLIC WORKS OF THE STATE OF CALIFORNIA et al., Defendants; STATE LAND SETTLEMENT BOARD, Appellant.

U. S. Webb, Attorney-General, Frank English and Charles A. Wetmore, Deputies Attorney-General, and Bond & Dierup for Appellant.

Jerome D. Peters for Respondents.

MR. JUSTICE THOMPSON (R. L.) DELIVERED THE OPINION OF THE COURT.—This is an appeal from a judgment entered against the defendant State Land Settlement Board, upon the rendering of a verdict for damages resulting from alleged fraud and misrepresentations on the part of the agents of the board which induced the purchase of certain land and for damages resulting from the maintaining of irrigation ditches which permitted the seepage of water which destroyed fruit-trees and alfalfa. The suit was voluntarily dismissed as to the defendant Department of Public Works.

The State Land Settlement Board was created by statute to promote the industry of agriculture in the state of California and to aid deserving soldiers and sailors who served the United States in war and others to procure and improve farms and establish homes. (Stats. 1917, p. 1566; 2 Deering's General Laws 1923, Act 8008.) This act was amended by adding to the Political Code of California section 361, subdivisions e, f and g, which preserve all the

powers and duties imposed by the original act, but transfer them for execution to a division of land settlement under the supervision of the agricultural department of the state of California. (Stats. 1927, p. 942.) Pursuant to the authority conferred by this act of the legislature, the State Land Settlement Board acquired a tract of land in Butte County consisting of 6,000 acres. This tract was subdivided into smaller parcels. An irrigation system was installed and maintained by the board in connection with the tract. November 21, 1918, the board sold to Harvey H. Dingman, according to the terms of a written contract, allotment number 82 of this tract, consisting of 39.84 acres of land, together with accompanying water rights, for the sum of $8,366.40. To aid the financing of this purchase the board executed and delivered to Dingman on February 14, 1919, an absolute deed of conveyance to said property, which was recorded April 3, 1919. Having negotiated a loan of $3,600 from the government, the grantee executed and delivered to the Federal Land Bank his note and mortgage upon this property to secure the loan. The grantee then executed and delivered to the State Land Settlement Board a deed of trust to said property for the balance of the purchase price, subject to said $3,600 mortgage. This deed of trust named George G. Kreutzer as trustee and the State Land Settlement Board as beneficiary. This trust deed was recorded April 3, 1919. George G. Kreutzer, who was named as trustee, was then employed as superintendent of the State Land Settlement Board. In order to facilitate the foreclosure of the deed of trust in the event of a default of its terms, the purchaser, Dingman, also executed and delivered to a trustee in escrow a deed of the premises to the State Land Settlement Board which was absolute in form. This deed was to be delivered to the grantee upon default of the grantor only upon written demand. No such demand was ever made and this escrow deed was never delivered.

Dingman, the original purchaser of allotment number 82, immediately took possession of the property and proceeded to farm and improve it. He made improvements thereon valued at about the sum of $5,500. He also paid the appellant approximately $1100 additional toward the purchase price. In 1921 he left the place, leasing it from time to time to tenants. Once Mr. Kreutzer leased the property for him.

In February, 1924, the plaintiffs visited the appellant's office at the colony at Durham, where they interviewed both Mr. Kreutzer, who was then acting as superintendent of the colony, and Margaret McRae, *née* Marshall, the secretary, regarding the purchase of a parcel of the land. They examined the Dingman tract and were told about the status of his title and that he had an equity in the property which cost him about $6,600. The plaintiffs asked Kreutzer if they could not buy that tract for less money. He testified that he said: "I hoped that they could; that I thought that any offer they would submit, I would be very glad to submit . . . to Mr. Dingman." Subsequently the plaintiffs sent the following telegram to Mr. Kreutzer at Durham:

"We offer Mister Dingman five thousand five hundred dollars cash for his equity and improvements (stop) His possession of entire allotment March First (stop) We to pay everything due thereafter Dingman to pay last years taxes (stop) This makes total cost twelve seven seventy two point nineteen

"(Signed) M. H. WALKER."

This offer was submitted to and accepted by Dingman. The sale of allotment number 82 was thereupon consummated to the plaintiffs. March 1, 1924, Dingman executed and delivered to the plaintiffs an absolute deed of conveyance, subject only to the $3,600 mortgage held by the Federal Land Bank and the deed of trust to Kreutzer as trustee for the State Land Settlement Board to secure the balance of the purchase price. This deed to the plaintiffs was recorded May 2, 1924. Incident to this sale and transfer to the plaintiffs of allotment number 82, the State Land Settlement Board executed a written consent to the transfer of title to them by Dingman subject to the mortgage for $3,600 held by the Federal Land Bank and the trust deed for the benefit of said board. This written consent, which was also signed by the plaintiffs, provided that the transfer to them "shall be subject to each and all of the terms, conditions, undertakings and promises of the said Harvey H. Dingman as described and included in the aforesaid agreement of purchase between said State Land Settlement Board and the said Harvey H. Dingman, dated November 21, 1918, and also contained in and included within the terms of a certain deed of trust made under date of March

20, 1919''. The plaintiffs also agreed with the board and did execute and deliver to a trustee, to be held in escrow, an absolute deed of conveyance of said property to the State Land Settlement Board. This deed, like the similar one which was previously executed by Dingman, was given in escrow to expedite the foreclosure of the trust deed in the event of default on the part of the plaintiffs. The plaintiffs assumed possession of the premises. There was then growing upon the property in good condition nine acres of prune trees and four acres of alfalfa. An irrigation system was also maintained.

March 2, 1928, this suit was commenced for damages against the appellant. Two causes of action were alleged. The first count charged Kreutzer, as superintendent of the State Land Settlement Board, and Mrs. McRae, as secretary of that board, with fraudulently representing to the plaintiffs that the land was perfectly drained and was exceptionally well adapted to the growing of prune trees and alfalfa and would support at least one cow per acre and that the rolling portion of the land could be leveled at an expense of not to exceed $50 an acre. The second count alleges loss and damages to the prune trees and alfalfa in the sum of $14,000 on account of negligence on the part of the board in constructing and maintaining an irrigation system with open ditches which permitted the percolation of water through the soil of plaintiffs' land, destroying the prune trees and alfalfa and ruining the fertility of the soil. A special demurrer to the complaint was overruled. The answer denied each of the material allegations of the complaint and affirmatively alleged that the court was without jurisdiction to try the cause against the State Land Settlement Board, which had no legal existence, since the transfer of all its powers were vested in the Department of Agriculture of the State of California by virtue of the amendments of the Political Code in 1927; that the Land Settlement Board, being a department of the state government, was not liable for the torts or fraud of its agents; that the land was purchased by the plaintiffs from Dingman and not from the state board; that the plaintiffs were estopped by the doctrine of laches from claiming damages and were also barred by the provisions of section 338, subdivision 4, of the Code of Civil Procedure. The cause was

tried by the court with the aid of a jury. Special issues were offered by the defendant tending to distinguish between the first and second causes of action. These issues were refused. The jury rendered a verdict of $10,000 without designating which cause of action the damages were based upon. The court reduced the amount of damages to $7,500, which was accepted by the plaintiffs. A judgment was entered accordingly, from which this appeal was perfected.

The evidence shows that while the fruit-trees and alfalfa on the plaintiffs' parcel and upon adjoining land appeared healthy and thrifty at the time of their purchase, they died during the seasons of 1925 and 1926 from the effect of excessive water. The respondent concedes that, while there is a conflict of evidence regarding the cause of the destruction of the trees and alfalfa, ''there was sufficient evidence to warrant the jury in believing that the prune trees and the alfalfa were destroyed by an excessively high water table which became apparent for the first time in the late summer of 1925''.

It is asserted by the appellant that the land was sold by Kreutzer in behalf of the original purchaser, Dingman, and not for the State Land Settlement Board and that fraud and deceit on his part could therefore not be charged to the board; that the plaintiffs were bound to take knowledge of the limitation of statutory authority which permitted the State Land Settlement Board to resell only such property as it owned and controlled; that the alleged statements of Kreutzer and McRae were mere trade opinions which were warranted by the appearance of the trees and crops and did not constitute misrepresentations or fraud; that the judgment fails to distinguish between the first and second causes of action and must therefore fail if either count is unsupported by the facts or the law; that the State Land Settlement Board is not a proper party defendant; that plaintiffs' causes of action were barred by the provisions of the statute of limitations and by laches.

The fact that this cause was maintained against the State Land Settlement Board did not result in a nonjoinder of parties defendant. The amendment of the Land Settlement Act by the adoption of section 361f of the Political Code transferred to the Department of Agriculture of the

State of California all the obligations and duties of the Land Settlement Board, but specifically preserved the identity and functions of the former board. (Stats. 1927, p. 942.) In the case of *Meyer* v. *State Land Settlement Board,* 104 Cal. App. 577 [286 Pac. 743], it was said with reference to the title of that action:

"The use of the expression 'State Land Settlement Board' legally meant the department of agriculture. From this it follows that the title in this action . . . must be held to be the same as though the title read 'Department of Agriculture'."

There can be no doubt as to the identity of the party against whom this action is maintained.

■ Clearly the record title to allotment 82 of the land was in Dingman at the time of plaintiffs' purchase and not in the State Land Settlement Board. While Dingman was then in default as to the payment of his installments under the terms of his trust deed, no action had been taken to foreclose this instrument. The title remained in him undisturbed and unassailed. Moreover, the entire transaction affecting the sale to plaintiffs was conducted with apparent knowledge and recognition of Dingman's title on the part of the plaintiffs. The sale was made only by consent of Dingman and the transfer of title was made directly from him to the plaintiffs. In determining the responsibility of the board for the conduct and representations of Kreutzer and McRae the plaintiffs were bound to take knowledge of the statutory limitations of authority on the part of the board to resell only such land as it actually owned and controlled. (*Mullan* v. *State,* 114 Cal. 578, 587 [34 L. R. A. 262, 46 Pac. 670, 673] *Whiteside* v. *United States,* 93 U. S. 247 [23 L. Ed. 882]; 46 C. J. 1032, sec. 287.)

In the Mullan case above cited it is said:

"One dealing with public officers is charged with the knowledge of, and is bound at his peril to ascertain, the extent of their powers to bind the state for which they seem to act. And, if they exceed their authority, the state is not bound thereby to any extent."

In the Whiteside case above cited the court says:

"Individuals as well as courts must take notice of the extent of authority conferred by law upon a person acting in an official capacity, and the rule applies in such a case

that ignorance of the law furnishes no excuse for any mistake or wrongful act.''

■ Since it is apparent the board had no légal authority to sell this land which belonged to Dingman, the representations of neither Kreutzer nor Marshall could bind it, assuming that the statements constituted fraud and deceit.

■ The respondents, however, contend that the legislative authority which is conferred by the Statute of 1893, page 57, 2 Deering's General Laws of 1923, Act 7928, to sue the state for negligence, implies that there is a liability on the part of the state for the wrongful or fraudulent act of its agents. This does not follow. Subdivision 1 of the act last cited does provide:

''All persons who have, or shall hereafter have claims on contract *or for negligence* against the state, not allowed by the state board of examiners, are hereby authorized . . . to bring suit thereon against the state . . . ''

This enactment, however, has been held to create no new liability against the state. It confers only an additional remedy for such liabilities as previously existed. (*Denning* v. *State,* 123 Cal. 316 [55 Pac. 1000]; *Miller* v. *Pillsbury,* 164 Cal. 199, 202 [Ann. Cas. 1914B, 886, 128 Pac. 327]; *Rauschan* v. *State Comp. Ins. Fund,* 80 Cal. App. 754, 761 [253 Pac. 173]; 23 Cal. Jur. 581, sec. 39.) In the Denning case above cited the court says:

''This statute has been considered by this court in at least two cases . . . and in both it was held that said statute did not create any liability or cause of action against the state where none existed before, but merely gave an additional remedy to enforce such liability as would have existed if the statute had not been enacted.''

■ We are of the opinion the record will not sustain the charge of fraud and deceit which is alleged in the first cause of action for the reason that the evidence refutes the possession of knowledge on the part of Mr. Kreutzer or Mrs. McRae, who made the statements complained of, that they were untrue, and it does not appear they had any reason to believe the statements were untrue. Fraud and deceit which will impose a liability for damages must consist of representations known by the parties charged to be false or which are not warranted by the information which they possess. (Secs. 1572 and 1710, Code Civ. Proc.; 12 Cal.

Jur. 826, sec. 75.) Confidential relations, from which this knowledge may be presumed, did not exist. In the absence of a special demurrer upon that particular issue, it may be assumed the allegations of the complaint were adequate.

The substance of the representations relied upon by the respondents to support the charge of fraud and deceit, are found in the testimony of Horace M. Walker, one of the plaintiffs. He said: "In the early part of February, 1924. . . . We (the plaintiffs) met Mrs. McRae at the office . . . (of the Durham Land Colony). . . . On the place that we actually purchased there was growing alfalfa, about four acres, and four acres of three-year-old French prunes, and five acres of four-year-old French prunes. We looked over the alfalfa, it was a fair stand of alfalfa, the prune trees looked well. We asked Mrs. McRae about the soil. She told us the soil was well adapted for the growing of alfalfa and to the raising of prune trees. We asked Mrs. McRae about the way prune trees produced in this place and she said they produced as well as any place on earth. . . . As we were going back she showed us some young prune orchards, and as we passed one place she said, 'This is the place that I was telling you about that in 1923 had four tons of dried prunes to the acre.' " Upon their return to the office the plaintiffs were introduced to Mr. Kreutzer, the superintendent. Regarding the representations which were made by the superintendent, Mr. Walker testified: "We talked in a general way with Mr. Kreutzer, and not anything particular, except that we would come back again to see the place in a few days. . . . We did come back. . . . We took up the question with Mr. Kreutzer about the Nevin place. We had been a little bit interested in the Nevin place, . . . (which was not purchased by the plaintiffs). Mr. Kreutzer said for us to go out to the Nevin property . . . and make him an offer for his equity. We went out to see Mr. Nevin and we looked the place over again." They then returned to the office and in further conversation with the superintendent, Mr. Walker said: "I asked Mr. Kreutzer if we would be able to keep 20 cows on that (Dingman) place, and he said we ought to be able to get in at least 15 acres more of alfalfa that year and that there would be no doubt but that we could keep 20 cows on the place after we had the alfalfa growing. . . . (He said) There was one cow to the acre of alfalfa. . . . And that there was running through this place

from west to east, an irrigation ditch." With reference to a map, the witness described the irrigation ditches which he found on the tract. He then added, "I asked Mr. Kreutzer if the ditches running through the property were any detriment to it, and he said they were not. He said it was a well-drained piece of property. In fact, he said it was the highest and best drained piece of property in the colony; that Robber's Gulch ran diagonally over it and was a natural drain". Regarding the nature of the soil, Mr. Walker testified that Kreutzer said: "I asked him about the soil and its adaptability for growing alfalfa and prune trees, and he said 'you have a very deep silt loam soil which is especially adapted for growing of prunes and alfalfa.'" And he added, "I asked him how much it would cost to level 15 acres, . . . and he said it would cost about fifty dollars an acre".

In determining the question of the sufficiency of the foregoing evidence, it should be weighed in the light of the surrounding circumstances. It is undisputed that Mr. Kreutzer and Mrs. McRae were employees of a state board which was created for the sole purpose of encouraging agriculture and aiding settlers to procure homes where they might secure a competency, without profit to the state. They therefore lacked the selfish motive which might inspire an owner of land who was anxious to dispose of his private property, or a real estate agent who was engaged in the business of selling land for commissions. Both the prune trees and the alfalfa which were growing on the place looked healthy and thrifty. On adjoining properties and in previous years both prune trees and alfalfa had prospered. There is no evidence to dispute the nature of the soil as it was described by Kreutzer. The property was favorably situated and well drained, as the plaintiffs could readily see from their inspection of the property. The superintendent had previously actually contracted for leveling similar land on the same tract for $50 an acre. The amount of dried prunes or alfalfa which the land would actually produce was necessarily speculative. Statements with respect to the character of the soil or the quantity of the products of the soil were mere opinions and may not become the basis of a charge of fraud and deceit. In 12 R. C. L. 277, section 42, it is said:

"Statements by the vendor of property as to its condition, quality, character, capacity, or adaptability to certain uses, are generally regarded as mere expressions of opinion, and when such is the case do not constitute fraud."

■ It was not disputed that during the winters of 1924 and 1925 an unusual amount of rainfall occurred and that the water table in the vicinity of the land in question was greatly elevated from the normal condition. These were the seasons during which the prune trees and alfalfa suffered most. It is not unreasonable to conclude that the raising of the normal water table was the chief cause of plaintiffs' loss. Of course, the agents of the appellant could not have anticipated this visitation of nature. At least it seems quite evident that these representatives of the appellant had no knowledge or reason to believe their statements were untrue. The evidence is therefore insufficient to support a judgment based upon fraud.

■ The evidence in support of the allegations of the second cause of action based upon a charge of negligence in maintaining irrigation ditches which permitted water to percolate through the soil of plaintiffs' land in quantities sufficient to destroy his trees and alfalfa seems weak and unsatisfactory. Assuming, however, that the evidence affecting this issue will support the second cause of action, it nevertheless becomes necessary to reverse the judgment since the first cause fails for lack of evidence and it is impossible to determine which theory the jury accepted as a foundation for its verdict, or whether damages were awarded on both causes, and if so, what proportion was allotted to each charge.

In view of the foregoing disposition of the vital issues of this case, it becomes unnecessary to consider other points raised on the appeal.

The judgment is reversed.